# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### SEPTEMBER SESSION, 1998

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **)** | **C.C.A. NO. 02C01-9710-CR-00388** |
| | **)** | |
| Appellee, | **)** | |
| | **)** | |
| | **)** | **SHELBY COUNTY** |
| **VS.** | **)** | |
| | **)** | **HON. ARTHUR T. BENNETT** |
| **JAMES M. WILLIAMS,** | **)** | **JUDGE** |
| | **)** | |
| Appellant. | **)** | (Leaving the Scene of an Accident |
| | **)** | Involving Death) |

FILED

January 5, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF SHELBY COUNTY

FOR THE APPELLANT:

ROBERT M. BRANNON, JR.
295 Washington, Suite 3
Memphis, TN 38103

THOMAS E. HANSOM
659 Freeman
Memphis, TN 38122

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

ELIZABETH T. RYAN
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

WILLIAM GIBBONS
District Attorney General

THOMAS D. HENDERSON
PERRY HAYES
Assistant District Attorneys General
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED _____

CONVICTION AFFIRMED; SENTENCE MODIFIED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant was tried before a jury on charges of vehicular homicide, driving while under the influence of an intoxicant, reckless driving, and leaving the scene of an accident involving death. The jury found him guilty of the Class E felony of leaving the scene of an accident involving death and found him not guilty of all other charges. The trial judge imposed a sentence of two years and denied any form of alternative sentence. The Defendant appeals from his conviction and his sentence. We affirm his conviction and modify his sentence.

Although the Defendant does not challenge the sufficiency of the convicting evidence, we will review the facts in detail because of their relevancy to the sentencing issues. On July 29, 1995, shortly before 4:00 p.m., the Defendant drove an automobile which struck and killed the victim, Bobby E. Russell, Jr., on a residential country road in Shelby County, Tennessee. At the time he was struck and killed, the victim had been using a gas-operated weed-eater along the edge of the front yard of his residence near the roadway. The victim apparently was either standing in the roadway or stepped into the roadway in the path of the vehicle the Defendant was operating. There was no evidence that the Defendant's vehicle left the roadway or that the Defendant was speeding at the time his vehicle struck the victim. The speed limit on the road at the scene of the accident was forty-five miles per hour, and all the proof indicated that the Defendant was traveling within the speed limit. The surface of the roadway was dry, and the Defendant apparently did not apply his brakes prior to the impact with the victim. Testimony indicated that there were patches of shade and

sunshine alternating along that portion of the roadway on that afternoon. The Defendant testified that he never saw the victim prior to the impact.

At the time of the accident, the Defendant was a twenty-one-year veteran of the Memphis Police Department who had attained the rank of major. Although off-duty, he was driving the unmarked police department vehicle assigned to him. The force of the impact of the victim's body with the Defendant's car was quite severe. The hood of the vehicle on the passenger side was substantially damaged, and the entire passenger side of the front windshield was shattered. Although the windshield remained substantially intact, some glass from the windshield shattered onto the front seat of the vehicle. The victim's body was thrown approximately forty-nine feet by the impact.

Immediately after the impact, although the Defendant apparently slowed his vehicle to a stop or near-stop, it is undisputed that he then drove further, eventually traveling about a mile to his own driveway. The Defendant testified that after the impact, he was covered by glass, and he thought he had possibly struck his head on the steering wheel. He said that he stopped and immediately picked up his police radio to attempt to get help because he knew then that he had hit a person and that emergency medical help would be needed. He said that he also attempted to use a cellular phone but that he could not get a response by using either the radio or the phone. He then assumed that he was in a "dead spot" insofar as using the phone or radio, so he proceeded up the road, continuously attempting to summon emergency assistance by radio and phone. He said that when he got to his house, he was still unable to establish contact by way of radio or cell phone and that he was going to go into his house

to use the phone to summon help. He then heard a siren in the distance, assumed that perhaps he had in fact been successful in getting help on the way, and immediately drove back to the scene of the accident. The testimony presented varied the length of time between the impact and the arrival of the Defendant back at the accident scene from five to fifteen or twenty minutes. According to records maintained by the Shelby County Sheriff's Department dispatcher, the first call came at 3:58 p.m., and a call was received from the Defendant at 4:08 p.m. Several witnesses testified that the Defendant was apparently attempting to use his radio and/or his cellular phone after he returned to the accident scene.

Dell Russell, the widow of the victim, was working in the yard near her husband when she heard the impact. She immediately ran to the house and called 911 for emergency help. She testified that it was perhaps fifteen minutes before the Defendant's vehicle returned to the scene, although in a previous statement she had estimated the time at five to ten minutes.

Franklin Perry Cathey, who was the victim's friend, brother-in-law, and neighbor, was among the first to arrive on the scene of the accident. He was a fireman who had some emergency medical training, and he and another person attempted to revive the victim. Mr. Cathey knew that the injuries were very serious and said the victim never regained consciousness. The Defendant arrived back at the scene while Mr. Cathey was there. Mr. Cathey said the Defendant was outside his car "punching on his telephone," and that he asked the Defendant to call for an emergency medical helicopter. He said that the Defendant told him that he could not get a signal.

-4-

Mr. Cathey's son, Russell Cathey, also arrived on the scene shortly after the accident. He knew the Defendant because he had played on a high school football team with the Defendant's son. He said the Defendant drove up while he was there and he saw him talking on his radio. He asked the Defendant to try to get them some help and the Defendant responded, "I'm trying. I'm trying." He testified that he smelled alcohol on the Defendant. The witness was about eighteen years old at the time of the accident. He said that he asked the Defendant if he had been drinking and the Defendant told him that he "'had a couple of beers at eleven o'clock.'" The witness said, "I'll say he was pretty much heavily intoxicated." The witness acknowledged that he did not tell anyone at the scene that he believed the Defendant was impaired due to intoxication. He said that it was not until sometime later at a "family meeting" with his family lawyer that he told them he had smelled alcohol and thought that the Defendant's ability to operate a vehicle was impaired.

Dorothy Burk was near the accident scene at the time of the accident. She heard the impact and saw the Defendant's vehicle leaving the scene "very fast." Later, at the scene, she said she heard the Defendant tell Russell Cathey that he "'had a drink earlier and another one, but I'm not drunk.'"

Michael Barry Cole, a fireman with the Shelby County Fire Department, arrived at the scene in response to the emergency call for assistance. He and two co-workers joined the effort to help the victim. He said the victim was "in very bad, bad shape, real bad shape." He could find no vital signs. He said the Defendant approached him and asked if the victim was going to make it, and he advised the Defendant that he did not think he was. He said the Defendant was

-5-

very calm, but was smoking cigarettes and chewing bubble gum. He said he detected an odor of alcohol about the Defendant but that he did not form an opinion concerning whether the Defendant was under the influence of an intoxicant. He worked with the victim until the helicopter arrived and the victim was transported to the hospital. Larry Crawford, another fireman who arrived with Cole in response to the emergency call, did not talk with the Defendant or observe him closely but did see him at a distance. He stated that by the way the Defendant was walking, he "could have been" under the influence of an intoxicant.

John Scott Harper, a patrolman with the Shelby County Sheriff's Office, was the first law enforcement officer to arrive at the scene. He was approached by the Defendant who introduced himself as Major Williams with the City Police Department. Patrolman Harper apparently did not know the Defendant prior to this time. He said the Defendant told him that he was the one involved in the accident. He said the Defendant told him that he had attempted to raise his dispatcher on the radio and to use his cellular phone, but he could not make contact. Therefore, he went home to call law enforcement and medical personnel and then returned to the scene. Harper said he noticed that the Defendant had bloodshot eyes and that while the Defendant was in his patrol car, he noticed a "slight smell of intoxicant on him." He transported the Defendant downtown after he was charged.

On cross-examination, the officer testified that he did not believe the Defendant's driving ability was impaired. He stated that while he was taking the Defendant downtown, the Defendant told him that he had been drinking late into

the hours of the night before. This officer signed the affidavit of complaint charging the Defendant with DUI, reckless driving, and leaving the scene of an accident, but he testified that he was ordered to place these charges against the Defendant. He was not asked and did not say who ordered him to charge the Defendant.

Memphis Police Officer Donald Leon Goldsby, Jr. testified that at the time of this accident he was assigned to the Metro DUI Squad, which was a combined unit of the Memphis Police Department and the Shelby County Sheriff's Office. He was dispatched to the scene of the crime. At that time he had known the Defendant for about twenty years, had worked with him in the Memphis Police Department, and considered the Defendant a friend. Because of his relationship with the Defendant, he objected to being asked to investigate the Defendant on a charge of DUI. He told his supervisors that he did not feel comfortable about testing the Defendant. He told them that he believed it was inappropriate for him to do the testing. Nevertheless, he was ordered to do the testing.

Officer Goldsby activated a video camera and filmed the Defendant as he was questioned and interviewed and as he performed field sobriety tests. He testified that the Defendant's eyes were red and watery and that he did notice an odor of an intoxicant. He recorded on the form he was filling out at the time that he believed any effect of alcohol on the Defendant was "very slight." On the form, he checked that the odor of alcohol was "faint," that the Defendant's attitude was "cooperative and polite," and that his speech was normal. He testified that his eyes were normal on the nystagmus test. He said the Defendant declined to take a breath-alcohol test. The jury viewed the video tape of the questioning and

testing of the Defendant, including a "one leg stand" and a "toe to heel walk." The witness testified that in his opinion the Defendant's ability to drive was not impaired.

Accident reconstruction experts testified that the speed of the Defendant's vehicle was approximately forty to forty-five miles per hour at the time of the accident. The speed limit on the road was forty-five miles per hour.

The State presented prior sworn testimony that had been given at a General Sessions Court proceeding by a witness who was in the area doing construction work on the day of the accident. He testified that immediately after the impact, he observed the Defendant's vehicle speeding away from the scene at a high rate of speed and that he subsequently observed the Defendant at the scene and he believed the Defendant was "very impaired."

The Defendant presented several witnesses on his behalf. Justin Gates was about sixteen years old at the time of the accident and played football with the Defendant's son. He said that on the day of the accident, the Defendant came by his house at about one o'clock to bring some materials about a fund-raising project for the football team. He said that he and the Defendant talked and watched a football game on TV for about an hour. He said that the Defendant was not drinking at the time and did not give him any indication that he had been drinking or was impaired.

Lieutenant Sammy Jones testified that he had been with the Shelby County Sheriff's Department for about nineteen years. He arrived at the accident scene

shortly after the accident and talked with the Defendant. He did not know the Defendant at that time. He said he called for the DUI investigation simply because someone told him that the Defendant had stated that he had had a beer and because the Defendant was a policeman.

An accident reconstruction expert employed by the Tennessee Highway Patrol also testified for the Defendant. He went to the accident scene the day after the accident occurred. His purpose in investigating this matter was to critique and review the investigative information gathered by the Shelby County Sheriff's Department. He expressed his opinion that the victim "had been weed eating the grass on the shoulder of the road and stepped back into the road into the path of the vehicle driven by the Defendant." He also opined that the Defendant's vehicle was traveling between forty and forty-five miles per hour. The Defendant introduced records from the Shelby County Sheriff's Office that indicated that the first call concerning the accident came in at 3:58 p.m. and that the first call from the Defendant was recorded at 4:08 p.m.

The Defendant testified in his defense. He joined the Memphis Police Department in 1974 as a patrolman. During the course of the next twenty years, he worked his way up through the ranks and was promoted to major in 1994 at the time he took over command of the auto theft division. He is married and has two children who are both adults. The accident occurred on a Saturday. He said that he got up at about 7:00 a.m. on that day, which was his day off. After having coffee and reading the paper, he went out and started working around his house. He mowed the yard, did some weed eating, and sprayed his dogs for ticks. After

he finished cutting the grass, he sat on his deck, throwing a ball for his dogs, and drank two beers. He did not drink any more alcoholic beverages that day.

About one o'clock, he got in his car and drove over to the Gates' residence to turn in some money that he had for the football team. He stayed there for about an hour talking with Justin Gates and watching a football game. He arrived back home at about 2:30 and flea-dipped his dogs. He then put some sacks of garbage in his patrol car and took them to a dumpster. When he was returning home around four o'clock, as he was driving through some intermittent shade and sunshine, his vehicle struck the victim. He said he did not see the victim until the body hit his windshield. The glass shattered and blew back in his face. He proceeded a little further, stopped and immediately reached for his car radio. His first thought was to get on the radio to try to get medical assistance. When he got no response, he thought he was in a "dead spot," so he proceeded along the roadway, trying to get someone to respond to his calls. He drove on to his house so that he could make a call there; and when he started to get out of the car, he heard a siren and went back to the scene of the accident. He said he was gone four to five minutes. When he got back to the accident scene, he continued to try to get a response on his radio and cell phone.

The Defendant said he refused the breathalyzer test because the type of machine used by the Memphis police was known to malfunction. He stated he did not want to participate in the test for that reason. He also confirmed that on the evening before the accident, ending at about midnight, he had drank a couple of beers.

On cross-examination, the Defendant admitted that he told Officer Goldsby that he had had nothing to drink that day, but he explained that he meant that he had not anything immediately prior to the accident. He denied that his driving ability was impaired due to alcohol, denied any reckless driving, and insisted that the only reason he drove away from the scene of the accident was to try to find a place where his car radio or cellular phone would function.

At the conclusion of all proof, the trial judge instructed the jury concerning charges of vehicular homicide by intoxication, vehicular homicide by recklessness, reckless homicide, leaving the scene of an accident when the driver knew or should have known that a death resulted from the accident, leaving the scene of an accident resulting in injury or death, driving under the influence, and reckless driving. The jury returned a verdict of not guilty on all charges except the Class E felony of failing to stop at an accident when the driver knew or should reasonably have known that death resulted from the accident.[1]

On appeal, in addition to sentencing issues, the Defendant raises the following issues: (1) the jury instruction concerning the charge of leaving the scene of an accident did not fairly state the statutory requirements of the offense, and the instruction concerning the definition of "forthwith" was neither necessary nor correct; (2) the trial court erred in instructing the jury concerning "flight"; and (3) when the jury returned its verdict of guilt on the charge of leaving the scene

---

[1]  Initially, the jury reported a verdict of "guilty of leaving the scene of an accident involving death." The judge instructed the jury to retire and deliberate and clarify whether they were finding the Defendant guilty of the Class E felony offense set forth at Tennessee Code Annotated § 55-10-101(b)(2) or the lesser included Class A misdemeanor offense found at Tennessee Code Annotated § 55-10-101(b)(1). The jury subsequently reported a verdict of guilty of leaving the scene of an accident involving death "as charged."

of the accident, the trial court erred by not further instructing the jury prior to additional deliberation concerning whether their guilty verdict was for the Class E felony charge found in Tennessee Code Annotated § 55-10-101(b)(2) or the Class A misdemeanor charge found at § 55-10-101(b)(1).

The trial court conducted the Defendant's sentencing hearing on September 3, 1997 and sentenced the Defendant on that date. The judgment which sentenced the Defendant appears to have been entered on the date of sentencing. The Defendant requested a delay in the "execution" of the judgment, and the trial judge eventually set the Defendant's appeal bond but stated that the judgment would not be "executed" until October 6, 1997, the date upon which he would hear the motion for a new trial. The judge stated that if the motion for a new trial was overruled, the Defendant could make his appeal bond on that date. The Defendant did not file his motion for a new trial until October 6, 1997.

A motion for new trial is required to be filed "within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This time period is mandatory and cannot be extended. Tenn. R. Crim. P. 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). A trial court does not have jurisdiction to hear and determine the merits of a motion for new trial which has not been timely filed. Martin, 940 S.W.2d at 569; Dodson, 780 S.W.2d at 780. Thus, a trial court's erroneous consideration of an untimely motion for new trial does not validate the motion. Id. The failure to file a motion for new trial in a timely manner renders waived those issues which may result in the granting of a new trial. Id. In other

-12-

words, an appellate court will not consider any issue raised in the motion unless it would result in dismissal of the prosecution. Id.

In the case sub judice, the order of sentence was entered on September 3, 1997. The Defendant filed a motion for a new trial on October 6, 1997, after the expiration of the thirty-day period. As a result, we must conclude that the Defendant has waived consideration of the issues relating to the trial court's jury instructions.[2]

In addressing the issues which the Defendant raises concerning his sentencing, we are faced with another problem stemming from a failure to file a motion for new trial in a timely fashion. A notice of appeal is required to be filed with the clerk of the trial court within thirty days after the date of entry of the judgment or order from which relief is sought. Tenn. R. App. P. 4(a). Timely filing of a motion for new trial tolls this period until entry of the order denying the motion for a new trial. Tenn. R. App. P. 4(c). In the present case, because the untimely motion for a new trial was a nullity, it did not toll the thirty-day period for filing a notice of appeal. See State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). The Defendant filed his notice of appeal on October 6, 1997, again beyond the 30-day period from the entry of the judgment of conviction on September 3, 1997. Of course, Rule 4(a) of the Tennessee Rules of Appellate Procedure provides that the notice of appeal document is not jurisdictional and

_____

[2] Of course, this Court has discretion to review the record for apparent errors to prevent needless litigation, injury to the interest of the public, and prejudice to the judicial process. Tenn. R. App. P. 13(b). Furthermore, it is within this Court's discretion to notice at any time an error affecting a substantial right of the defendant, even though not raised in a motion for new trial, where necessary to do substantial justice. Tenn. R. Crim. P. 52(b). We decline to exercise our discretion in the case at bar.

that timely filing may therefore be waived in the interest of justice. The Defendant points out that the trial court delayed "execution" of the sentence until the date that the motion for a new trial was to be heard. We have determined to exercise our discretion and waive the timely filing of the notice of appeal in order to consider the Defendant's sentencing issues.

The Defendant asserts that the trial court erred in sentencing him by: (1) erroneously admitting into evidence victims' statements at the sentencing hearing; (2) admitting irrelevant testimony and/or unreliable hearsay at the sentencing hearing; (3) not finding the Defendant to be an especially mitigated offender; (4) denying the Defendant judicial diversion; and (5) denying the Defendant any form of alternative sentencing.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is ?conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement

that the defendant made; and (g) the potential or lack of potential for rehabilitation or treatment. State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the trial court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The trial court conducted a sentencing hearing during which both the State and the Defendant introduced additional proof. The first witness for the State was the victim's widow, who read a lengthy letter which she had prepared and which was included with the presentence report. She described the impact that her husband's death had on her life. She acknowledged the jury's verdicts of not guilty of vehicular homicide, DUI, and reckless driving, but asserted that although the Defendant was found "not guilty," he was not "innocent." She testified that at the time of the accident, the Defendant's driving ability was impaired due to alcohol. She described the emotional and financial hardship that her husband's death had placed on the family. She quite forcefully and dramatically expressed and emphasized her heartfelt and sincere grief over the loss of her husband. She asked that the Defendant not receive any special treatment because he was a major in the Memphis Police Department and asked that he be sentenced to the maximum punishment allowed by law.

The victim's sister was also allowed to give "victim impact" testimony. She also read a letter which she had prepared. She described her grief and the impact that her brother's death had on her family. She expressed her opinion that the Defendant was "a menace to society." She said that the Defendant "plowed into my brother like an animal in the road, leaving him to die." She questioned, "And did this jury really make it's [sic] own mind up? Or did someone tell them they must come back with a not guilty verdict? Or maybe, a last minute plea bargain." The State then called the victim's daughter to testify. She was allowed to read a letter that her cousin had written. The letter referred to the man who had "murdered" the victim. The witness also expressed her grief over the death of her father. In addition, the victim's brother-in-law was allowed to give "victim impact" testimony.

The Defendant presented character evidence on his behalf. He was described as a "genuine, sincere, caring person." The witnesses described the Defendant's remorse over the accident. The Defendant was described as a good police officer, a good family man, conscientious, honest, caring, and generous.

The Defendant testified that this event had "devastated" his life. He related that he had lost his job and his career, that he was earning much less than he had before, and that his family was on the verge of losing its home. He expressed his remorse and said that he would give anything if he could change what had happened. He said, "I'd give anything if he was a live [sic] today. I think about it sleeping and eating and getting up and I'm sorry. I'm sorry, but I can't bring him back."

The presence report reflected that at the time of sentencing, the Defendant was forty-four years of age and married with two children. He began employment with the Memphis Police Department immediately after graduating from college in 1974. His employment with the Memphis Police Department was terminated several weeks after the automobile accident. At the time of sentencing he was employed with Mid-South Graphics in Memphis with a salary of nine dollars an hour.

In sentencing the Defendant, the trial judge first noted the severity of the impact of the victim's body with the Defendant's vehicle and expressed his concern with the fact that the Defendant drove away knowing that he had struck a pedestrian with great force. The trial judge stated that he did not believe the Defendant's explanation that the only reason he drove off was to try to summon assistance. The judge expressed his strong belief that anyone would immediately want to stop and try to determine how serious the injuries were and try to offer assistance. He also expressed his opinion that the Defendant's law enforcement training and experience should have heightened his responsibility to immediately stop and render assistance if possible.

The court found no statutory mitigating factors other than the fact that the Defendant had no prior record, had been gainfully employed for over twenty years with the Memphis Police Department and had a stable family and social history. Although the trial court did not specifically make a finding in this regard, the court apparently applied as an enhancement factor that the Defendant abused a position of public trust because he was a police officer convicted of violating the law.

In enhancing the Defendant's sentence from the presumed minimum of one year up to the maximum of two years, the court stated, "Based on all of the facts and circumstances in this case, that it will set the punishment at two years as a Range I standard offender in this matter." In denying judicial diversion, the Court cited the fact that the Defendant was a police officer, and under the circumstances of this case, that factor dictated against judicial diversion. Concerning the Defendant's request for probation or other alternative sentencing, the trial court stated, "The Court also feels from all of the facts and circumstances that probation at this time, based on all of the facts and circumstances is denied. And alternative sentencing also, at this time, denied." The trial judge also stated that he was declining to sentence the Defendant as a mitigated offender based again upon the Defendant's status as a police officer and his heightened obligation to comply with the law.

When determining the length of a sentence, the trial judge shall start at the minimum sentence, increase it considering appropriate enhancement factors, and decrease it considering appropriate mitigating factors. Tenn. Code Ann. § 40-35-210(e). The Defendant herein was convicted of a Class E felony and sentenced as a standard offender, and thus was entitled to the presumption that he is a favorable candidate for alternative sentencing. Tenn. Code Ann. § 40-35-102(6). Because the record does not affirmatively show that the trial court considered these sentencing principles, we review the sentence <u>de novo</u> without a presumption of correctness. <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant argues that the trial judge erred by admitting into evidence the victims' statements at the sentencing hearing and also by admitting irrelevant testimony and/or unreliable hearsay. The Defendant argues that the crime of leaving the scene of an accident involving death is not a crime with a "victim" and the family of the deceased should not have been allowed to testify relevant to the sentencing of the Defendant. See Tenn. Code Ann. § 40-35-209(b). The Defendant acknowledges that reliable hearsay is admissible at a sentencing hearing, but he argues that some of the hearsay admitted was not reliable and that some of the testimony presented was not relevant. Although we acknowledge that some of the testimony given by the victim's family was of limited relevance to the sentencing issues properly before the trial judge, we believe the trial judge acted within his discretionary authority in allowing the testimony and hearsay to be presented.

The Defendant next contends that the trial judge erred or abused his discretion by not classifying him as an especially mitigated offender instead of a standard offender. A trial court may find a defendant to be an especially mitigated offender if the defendant has no prior felony convictions and the court finds mitigating, but no enhancement factors. Tenn. Code Ann. § 40-35-109. As the sentencing commission comments point out, a finding of an especially mitigated offender is discretionary with the trial court. From this record, we cannot conclude that the trial judge abused his discretion in sentencing the Defendant as a standard offender.

The Defendant also argues that the trial judge erred in denying him judicial diversion. See Tenn. Code Ann. § 40-35-313. Tennessee courts have

recognized the similarities between judicial diversion and pretrial diversion and, thus, have drawn heavily from the case law governing pretrial diversion to analyze cases involving judicial diversion. For instance, in determining whether to grant pretrial diversion, a district attorney general should consider the defendant's criminal record, social history, mental and physical condition, attitude, behavior since arrest, emotional stability, current drug usage, past employment, home environment, marital stability, family responsibility, general reputation and amenability to correction, as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that pretrial diversion will serve the ends of justice and best interests of both the public and the defendant. See State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993); State v. Hammersley, 650 S.W.2d 352, 355 (Tenn. 1983). A trial court should consider the same factors when deciding whether to grant judicial diversion. See State v. Bonestel, 871 S.W.2d 163, 167 (Tenn. Crim. App. 1993); State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). Moreover, a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration. See Bonestel, 871 S.W.2d at 168.

In addition, this Court applies "the same level of review as that which is applicable to a review of [a] district attorney general's action in denying pre-trial diversion." State v. George, 830 S.W.2d 79, 80 (Tenn. Crim. App. 1992); see also Bonestel, 871 S.W.2d at 168; Anderson, 857 S.W.2d at 572. In other words, this Court reviews the record to determine whether the trial court abused its discretion. See Bonestel, 871 S.W.2d at 168; Anderson, 857 S.W.2d at 572. To

find an abuse of discretion, we must determine that no substantial evidence exists to support the ruling of the trial court. See Bonestel, 871 S.W.2d at 168; Anderson, 857 S.W.2d at 572.

The trial judge did not explain his specific reasons supporting the denial of judicial diversion or why those factors applicable to the denial outweighed the favorable factors. From our review of this record, although the trial judge would have acted within his discretionary authority had he granted diversion, we cannot say that he abused his discretionary authority by denying it. The trial judge presided over this lengthy trial and obviously was in the best position to determine factors such as the Defendant's attitude and demeanor. Although it is obvious that the jury which heard the charges against the Defendant determined that the evidence was insufficient to find the Defendant guilty beyond a reasonable doubt of any offense other than leaving the scene of the accident, the trial judge's decision obviously was based in part upon his consideration of all the evidence presented at trial. On the issue of whether to grant judicial diversion, we defer to the discretion of the trial judge in the case sub judice.

We now address the issue of whether the trial judge erred or abused his discretion in denying the Defendant any form of alternative sentencing. If an accused has been convicted of a Class C, D, or E felony and sentenced as an especially mitigated or standard offender, there is a rebuttable presumption that the accused is a favorable candidate for alternative sentencing unless disqualified by some provision of the Tennessee Criminal Sentencing Reform Act of 1989. Tennessee Code Annotated § 40-35-102 provides in part:

(5) In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration; and
(6) A defendant who does not fall within the parameters of subdivision (5) and who is an especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary.

The sentencing process must necessarily commence with a determination of whether the accused is entitled to the benefit of the presumption. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). As our supreme court said in Ashby: "If [the] determination is favorable to the defendant, the trial court must presume that he is subject to alternative sentencing. If the court is presented with evidence sufficient to overcome the presumption, then it may sentence the defendant to confinement according to the statutory provision[s]." Id. "Evidence to the contrary" may be found in applying the considerations that govern sentences involving confinement, which are set forth in Tennessee Code Annotated § 40-35-103(1):

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1); see Davis, 940 S.W.2d at 561; Ashby, 823 S.W.2d at 169. The presumption can be successfully rebutted by facts contained in the presentence report, evidence presented by the state, the testimony of the accused or a defense witness, or any other source provided it is made a part of the record. State v. Bonestel, 871 S.W.2d 163, 167 (Tenn. Crim. App. 1993).

Beyond this, a defendant has the burden of establishing his or her suitability for total probation. Tenn. Code Ann. § 40-35-303(b). To be granted full probation, a defendant must demonstrate that probation will "'subserve the ends of justice and the best interests of both the public and the defendant.'" Hooper v. State, 297 S.W.2d 78, 81 (Tenn. 1956); see also State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996) (quoting Hooper); State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (same). The trial court must consider a sentence which is the "least severe measure necessary to achieve the purposes for which the sentence is imposed" and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant." Tenn. Code Ann. § 40-35-103(4), (5).

Probation may be denied based on the circumstances of the offense; however, "as committed, [the criminal act] must be 'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring probation." State v. Cleavor, 691 S.W.2d 541, 543 (Tenn. 1985) (quoting State v. Travis, 622 S.W.2d 529, 534 (Tenn. 1981)). This principle has been codified in § 40-35-103(1)(B), which considers confinement to avoid depreciating the seriousness of the offense. State v. Hartley, 818 S.W.2d 370, 375 (Tenn. Crim. App. 1991); see also State v. Fletcher, 805 S.W.2d 785, 787 (Tenn. Crim. App. 1991). Sentencing decisions should not, however, turn on a generalization of the crime committed, such as the fact that a death occurred. State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995).

Probation may also be denied based on whether the sentence will deter others. The sentencing act provides that "[p]unishment shall be imposed to prevent crime and promote respect for the law by . . . [p]roviding an effective general deterrent to those likely to violate the criminal laws of this state." Tenn. Code Ann. § 40-35-102(3)(A). Also, our supreme court has reiterated that "[b]ecause there is a degree of deterrence uniformly present in every case, however, the significance of this factor 'varies widely with the class of offense and the facts of each case.'" Davis, 940 S.W.2d 558, 560 (Tenn. 1997) (quoting State v. Michael, 629 S.W.2d 13, 14-15 (Tenn. 1982)). "[A] 'finding of deterrence cannot be conclusory only but must be supported by proof.'" Id. (quoting State v. Ashby, 823 S.W.2d 166, 170 (Tenn. 1991)).

The Defendant began this trial with the presumption that he was innocent of all criminal charges. When the jury returned the verdict of not guilty of vehicular homicide, DUI, and reckless driving, this presumption of innocence became a legal conclusion. Although the victim's family and friends sincerely and strongly disagree with the verdict, the jury absolved the Defendant of any criminal culpability for causing the death of the victim. Our law cannot allow the Defendant to be sentenced for crimes of which he has been acquitted.

While the Defendant should certainly receive no leniency or special consideration due to his status as a police officer, we also do not believe he should be dealt with harshly just because he was an officer when this accident occurred. His crime is not one involving public corruption or reflecting a contrived plan or scheme to violate the law. While it does not appear that he fled the scene

of the accident to avoid detection, even if he did, he promptly reconsidered and returned.

The Defendant is a first offender convicted of a Class E felony. He has no history of criminal conduct. The record suggests no negative factors in the Defendant's background and social history; to the contrary, the record reflects an impressive and solid record as a productive member of society. He clearly is not an offender for whom incarceration is a priority. His potential for rehabilitation appears to be excellent. We believe the factors favoring probation clearly outweigh any factors suggesting incarceration.

We modify the sentence imposed by the trial judge to reflect that the sentence shall be served on probation, with the terms and conditions of probation to be set by the trial judge. In all other respects, the judgment is affirmed.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
PAUL G. SUMMERS, JUDGE


_____
JOE G. RILEY, JUDGE